**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRACEY A. FULLER, Plaintiff, | ) | CIVIL ACTION NO. 3:2004-285 |
| v. | ) | JUDGE GIBSON |
| GLOBAL CUSTOM DECORATING, Defendant. | ) | |

# MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on Global Custom Decorating, Inc.'s[1] (hereinafter "Defendant") Motion for Summary Judgment (Document No. 17). In accordance with the analysis herein, the Court will grant the motion in part and deny the motion in part.

## I. Concise Statement of Undisputed Material Facts[2]

[Defendant] is a company that decorates specialty glass products for Progressive Specialty Glass, Inc. ([hereinafter] "Progressive"). [Defendant] does not manufacture the actual plastic or glass, but

---

[1]It appears from all indications of the Defendant, that it was improperly designated as "GLOBAL CUSTOM DECORATING" within the caption, but is correctly named "Global Custom Decorating, Inc." *See* Answer to Amended Complaint (Document No. 10), p. 1.

[2]The following facts are based upon the Defendant's Concise Statement of Undisputed Material Facts (Document No. 20) and the Plaintiff's Response thereto (Document No. 28) and the Plaintiff's Statement of Additional Material Facts (Document No. 29) to the which the Defendant did not respond. All of the Plaintiff's additional material facts are entered of record, with one revision by the Court, as they were not disputed by the Defendant in accordance with Local Rule of Court 56.1 (E). Any facts that were submitted by the Plaintiff in her Response that were supported in the record and used to clarify the Defendant's proposed statements have also been added. The submissions of the parties were used with any additions to a proposed material fact used or any additional proposed material fact in the record but not offered by the parties are indicated in brackets. Any proposed facts not contained within the following recitation of facts were found by the Court to remain disputed in the record or to be immaterial.

rather, applies decals and logos to plastic and glass products, and then ships them to its customers. [Defendant] currently employs approximately 30 persons at its plant in Curwensville, Pennsylvania in which it has conducted its business since March 2003. Prior to that, [Defendant] conducted its business at a plant in DuBois, Pennsylvania from 1997 to March, 2003. During the entire period of Plaintiff's employment, Ron Schoelkopf ([hereinafter] "Schoelkopf") was the Purchasing Coordinator for Progressive and had complete overall responsibility for the operations of [Defendant's] DuBois and Curwensville plants. At its two plants, [Defendant] typically employed a Plant Manager who was responsible for the day-to-day operations of the plant and reported directly to Schoelkopf. Schoelkopf has the authority to hire, fire and direct the activities of a Plant Manager at [Defendant's] plants.

Plaintiff Tracey Fuller [hereinafter "Plaintiff"] was hired by [Defendant] to work at [Defendant's] DuBois Pennsylvania plant on May 1, 1997. [Plaintiff] received a copy of [Defendant's] employee handbook which contains a Non-Harassment, Discrimination and Retaliation policy. The Non-Harassment, Discrimination and Retaliation policy also includes a procedure by which an employee can report discrimination or harassment without fear of retaliation. The first position Plaintiff held with [Defendant] was that of secretary, for which she was paid $6.00 per hour. Plaintiff later was promoted from secretary to the position of Supervisor-Top Shelf Department, by Plant Manager Tim Carr [hereinafter "Carr"]. On March 5, 2001, Plaintiff again was promoted by Carr from Supervisor-Top Shelf Department, to Manager-Global and Top Shelf Shipping. []Carr was terminated from his plant manager position with [Defendant] in August 2001, at which time ["Schoelkopf"] offered Plaintiff the Plant Manager position for the DuBois plant. The duties of the plant manager position involved overseeing the day-to-day running of the business, including such areas as safety, production, inventory

control and purchasing. Plaintiff declined Schoelkopf's offer of the plant manager position.

According to Dorothy Spencer, a former co-worker of Plaintiff, Plaintiff refused the plant manager position because she was uncomfortable with the metallizing process and did not want to be responsible for it. [The Plaintiff stated in her deposition that, at the time the position was offered, she was not familiar with the mirror coating room (presumably another name for metallizing process), that she did not feel she could run that process and that, as a result, she was not qualified. Plaintiff also stated that [] Schoelkopf was aware of this at the time of the offer.] The metallizing process is a two-step process which involves the application of metal plating to glassware so that it may be spray-painted. [Defendant] performed metallizing at its DuBois plant from early 2001 until March 2003. Metallizing was performed at the Curwensville plant from its beginning in March 2003 until May 2004 when [Defendant] began to use an outside vendor to handle the plating portion of metallizing process. The Curwensville plant always has performed the spraying part of the metallizing process. As a result of Plaintiff declining Schoelkopf's offer to be Plant Manager, on September 17, 2001 [Defendant] hired Mark Kelly for the position of Plant Manger. Kelly held this position until October 20, 2002 when he was terminated. For the year 2002, Mark Kelly, who, at the time, was employed by Defendant as plant manager, was paid $42,091.58. [Plaintiff stated that she had become familiar with mirror coating, and thus, fully qualified for the plant manager position, during Mark Kelly's time as plant manager.] [Plaintiff was officially promoted to the position of production manager in June 2002.] In her position as Production Manager, Plaintiff was paid a salary of $31,000.00 per year. As Production Manager, Plaintiff was responsible for overseeing production in several departments-decal, printing, mirror coating and shipping. As production manager, Plaintiff's duties included scheduling production and

shipping, overseeing the production processes, monitoring inventory and keeping it moving in and out, managing all production supervisors and the shipping supervisor, and through them, all production employees (Fuller Dep. pp. 49-55; Hupp Dep. p. 43). According to Plaintiff, her duties were "to schedule orders being produced and leaving on a timely manner" and "overseeing the people in general, any questions, and then reporting back to the plant manager if necessary." As Production Manager, Plaintiff also conducted production meetings. The supervisors of the decal, printing, mirror coating and shipping departments reported to Plaintiff and attended the production meetings.

In March 2003, [Defendant] relocated its operation from DuBois to a larger facility in Curwensville, Pennsylvania. The relocation of [Defendant's] operations from DuBois to Curwensville was only physical, and there was no real change in [Defendant's] operation or processes with the exception of a new inventory system. Plaintiff continued to hold her Production Manager position after [Jan] Hupp [(hereinafter "Hupp")] was hired and trained as Plant Manager. Plaintiff was capable of repairing and operating all machines at the Defendant's plant with the exception of the three color machine, which was a new machine that no one knew how to operate or repair properly while she was employed by the Defendant, [and the "mirror coating machine which she could set up, but could not repair]. [] Kalgren stated that everyone at the plant knew how to maintain the machines as they went long periods without a maintenance man.

As part of the reorganization in November 2003, having eliminated the Production Manager position, [Defendant] assigned Plaintiff to the newly created position of Manager of Human Resources, Office and Shipping. This aspect of the reorganization resulted in [Defendant] removing a male employee, Jason Shimmel, from his position as an office administrative assistant and reassigning him

to a production job on the floor. [Jason Shimmel was moved back to the position of office administrative assistant, a secretarial position, after Plaintiff resigned.] As the Manager of Human Resources, Office and Shipping, Plaintiff was responsible for payroll, human resources, and inventory. This reassignment of position and change in responsibilities did not result in a decrease in salary for Plaintiff. Plaintiff still was responsible for the supervision of several individuals-an Inventory Clerk, a Shipping Supervisor and Top Shelf shipping person. Plaintiff's position as Manager of Human Resources, Office and Shipping was at the level of management just below that of Plant Manager, [] Hupp. [] Hupp was employed by Defendant as plant manager from August 11, 2003 through mid-January, 2004. During the five month period of 2003 that Mr. Hupp was employed by Defendant, he was paid $19,481.53. This equates to an annual salary of $46,755.71.

As a courtesy, on Friday, January 16, 2004, Schoelkopf called Plaintiff at home and told her that [] Hupp no longer was employed by the company. [Schoelkopf also informed Plaintiff that she was to train the two co-plant managers.] He told her that, effective Monday, January 19, 2004 [Defendant] again was reorganizing and implementing a structure consisting of two co-plant managers. The two co-plant managers were to be Rick Schoening [(hereinafter "Schoening")], a maintenance/engineer with the company, and David Swatsworth [(hereinafter "Swatsworth")], an electrician for the company. [] Schoening was made co-plant manager in January, 2004. During 2004, the Defendant paid []Schoening $38,790.00. [] Swatsworth was made co-plant manager in January, 2004. During 2004, the Defendant paid [] Swatsworth $41,501.29.

Plaintiff had been absent from work due to flu during the last week of Hupp's employment-January 12-16, 2004. Plaintiff saw her physician, Dr. Bradley, on January 14, 2004 and he provided

her with an excuse for being absent from work. On January 14, 2004, when she saw Dr. Bradley, Plaintiff scheduled a follow-up appointment for January 23, 2004. On January 19, 2004, at the time of the Schoening and Swatsworth promotions to the newly-created co-plant manager positions, Plaintiff held the position of Manager of Human Resources, Office and Shipping. During the work-week of Monday through Thursday, and a half-day on Friday, the 23rd ...[Plaintiff performed] her regular duties without incident. During the week of January 19 through January 23, 2004, Plaintiff made no complaints about Schoelkopf's promotion of Schoening and Swatsworth over her, nor did she inquire as to why she wasn't offered the plant manager position. On January 23, 2004, seven days after the promotions of Schoening and Swatsworth, Plaintiff left work early for her pre-planned doctor's appointment and that afternoon faxed to [Defendant] her resignation letter. The Plaintiff's resignation letter was handwritten on the bottom of a letter from her doctor indicating that she was resigning her employment for medical reasons. [[T]he January 23, 2004 doctor's appointment was scheduled as a follow up to her January 14, 2004 visit. During the January 23, 2004 visit, Plaintiff's doctor, Dr. Bradley, who had been treating her for several years due to work related stress and anxiety, listened to Plaintiff's report of recent occurrences at the plant, including the fact that she had had a panic attack that day because she was upset about the way she was being treated [as compared to] [] Schoening and Swatsworth, and informed Plaintiff that she had to choose between her job and her health. Plaintiff decided during this doctor's office visit that she would resign. Dr. Bradley then issued a letter stating that "I have advised Tracy, for medical reasons, which I attribute to her job and working conditions, to seek employment elsewhere. Dr. Bradley subsequently issued a letter stating that the work environment to which Plaintiff was subjected was enough of a stressor that it was reasonable for her to resign under

the circumstances.] On January 23, 2004, the date of her resignation from [Defendant], Plaintiff was earning $31,000.00 annually.

On November 12, 2004, Plaintiff filed her federal lawsuit against [Defendant] alleging wage discrimination under the Equal Pay Act [(hereinafter "EPA")] and gender discrimination under Title VII [of the Civil Rights Act if 1964] and the [Pennsylvania Human Relations Act (hereinafter "PHRA")]. Plaintiff claims that she unlawfully was paid less than other production managers in violation of the [EPA]. Plaintiff also claims that while working as plant manager for [Defendant], she was paid less than male plant managers.

[]Schoening held only two positions with [Defendant]-Maintenance and Co-Plant Manager and never held the position of Production Manager. [] Swatsworth held only two positions with [Defendant]- Maintenance/Electrician and Co-Plant Manager and never held the position of Production Manager. [] Schoening, [] Swatsworth and Plaintiff never held the same positions at any time while they worked for [Defendant]. [Schoening and Swatsworth did become co-plant managers and Plaintiff had performed the duties of both plant manager and production manager during periods when the position was technically vacant.] Prior to being promoted to co-plant manager, [] Schoening was a diesel mechanic who worked as the maintenance man at the plant. Prior to being promoted to co-plant manager, [] Swatsworth was an electrician employed as a maintenance man. [] Hupp, who had the opportunity to observe [] Schoening and [] Swatsworth work, did not believe them to be qualified to take over the production area.

Plaintiff also claims that she was subjected to a hostile work environment based upon her sex. [Among] [t]he [] evidence of Plaintiff's claim of hostile work environment is the following: a.)

Plaintiff's co-worker Dorothy Spencer testified a hostile work environment existed based on the fact "there was always arguing going on." b.) Spencer testified that former plant manager [] Carr would throw things when things went wrong on the floor in 1999. c.) Plaintiff's co-worker [] Kalgren testified that the hostile work environment was based upon the fact that she believed "the men" had a low opinion of women and were male chauvinists. d.) Plaintiff testified that Schoelkopf lost his temper at work and that he threw things, including a chair, pen, paper, and a phone. e.) Plaintiff testified that [] Schoelkopf's manner of dress showed disrespect to women; f.) Plaintiff testified that both Schoelkopf and Schoening dressed such that their pants showed "the crack[s] of [their butts]." g.) Plaintiff testified, however, that this clothing issue was "absolutely not" the reason she filed her complaint. h.) ...[Plaintiff] was required to train [] Hupp and asked to train [] Schoening and Swatsworth for the position of plant manager while not being promoted to this position herself despite expressing interest in same; i.)...[I]n November, 2003 [Plaintiff] was demoted from production manager to the less prestigious position of office manager, a position with significantly different material responsibilities, after being told that she would be returned to the production manager position after [] Hupp's training was complete. Plaintiff also claims that these above factors created a hostile work environment which compelled her to resign her employment, thus, constituting a constructive discharge. Plaintiff claims that she believed she would get the vacant plant manager position in August 2003 instead of [] Hupp, a male. Plaintiff also claims she was denied the opportunity to apply for the vacant plant manager position in January 2004 when Hupp was terminated.

Plaintiff claims that she discriminatorily was demoted from her production manager position in November 2003. Plaintiff had been reassigned to be Manager of Human Resources, Office and

Shipping in November 2003 due to the elimination of Plaintiff's Production Manager position, the responsibilities of which were assumed by and consolidated with the Plant Manager position. [These combined duties were subsequently redivided among two people, Schoening and Swatsworth, although the Defendant decided to call them co-plant managers....] Since the elimination of Plaintiff's production manager position in November 2003, [the job title of production manager] no longer existed.... The position of Manager, Human Resources, Office and Shipping was, like Plaintiff's former production manager position, just below the position of plant manager, [[W]hen Plaintiff was production manager, the department supervisors reported directly to her and she reported to the plant manager. After the [change in title],[3] the supervisors, like Plaintiff, reported to the plant manager.] Plaintiff experienced no decrease in pay []when she was reassigned to the Manager, Human Resources, Office and Shipping position. The position description for the HR manager, office manager, shipping manager position stated that the duties of the position were: (1) Human Resources responsibilities including applications, payroll, benefits, initial interviews, safety policies and teams, safety meetings, safety review board, conduct safety inspections; (2) current office work; (3) managing shipping supervisor and employees; (4) direct Top Shelf activities; (5) work with inventory clerk to insure stock of all glassware, maintain inventory, and conduct weekly cycle checks and monthly inventories; and (6) conduct profit studies on plant operations. (Fuller Dep. Exh. 7).

Plaintiff never once complained to [Defendant] that she was treated differently because of her gender. Plaintiff received [] salary increases throughout her employment with [Defendant].... Plaintiff

---

[3]The Plaintiff suggested the use of the word "demotion" but the record does not bear this conclusion at the present time and such a word also has an impact on the legal conclusion regarding violations of the EPA and Title VII claims.

even told a prospective employer to which she had applied on February 15, 2005, that she had left Global because she wanted to get a job closer to Brookville where her son goes to school. [However, the Plaintiff testified at deposition that this was not her real reason for leaving employment.] [Defendant] employed many women in supervisory positions who were promoted by Schoelkopf including Plaintiff, Dorothy Spencer, Tamara Kalgren, Lisa Schoening, Annie Updyke, Karen Nelson and Pat Burham. [However, [Defendant] has not had a female hold the title of plant manager. The supervisors of the decal, printing and mirror coating departments ...were [all] females, and the supervisor of the shipping department was a male. Furthermore, [] Kalgren stated that she became supervisor of the decorating department long after she started doing the duties of the position. She also stated that she received the position only after she had informed [] Carr that she was tired of training men for the position and would not do it anymore. [] Kalgren further stated that she was uncertain if she ever formally held the title of supervisor. [] Kalgren stated that Plaintiff was instrumental in getting [] Kalgren appointed to the supervisor position....] [] Schoelkopf was not present at the plant on a daily basis. The collective testimony of Kalgren, Hupp and Spencer indicates that [] Schoelkopf would come to the plant at least once every few weeks and stay for a period of three days to one and a half weeks. Plaintiff had complained to [] Schoelkopf concerning his inappropriate attire, specifically "showing the crack of his butt", but he continued to do it.

## II. Analysis

### A. Summary Judgment Standards

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552- 57, 91

> L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638].

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes*, 398 U.S. at 158-159, 90 S.Ct., at 1608-1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 - 2514, 91 L.Ed.2d 202, 216 (1986).

**B. Discussion**

**1. EPA**

The Equal Pay Act (hereinafter "EPA") is codified at 29 U.S.C. § 206(d)(1) and reads as follows:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex, by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except, where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation or this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

EPA claims follow a "two-step burden shifting paradigm":

> The plaintiff must first establish a *prima facie* case by demonstrating that employees of the opposite sex were paid differently for performing "equal work"-work of substantially equal skill, effort and responsibility, under similar working conditions. *E.E.O.C. v. Delaware Dept. of Health and Social Services*, 865 F.2d 1408, 1413-14 (3rd Cir.1989). The burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the Act. *Id.* at 1414 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Thus, the employer's burden in an Equal Pay Act claim-being one of ultimate persuasion-differs significantly from its burden in an ADEA claim. Because the employer bears the burden of proof at trial, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense "so clearly that no rational jury could find to the contrary." *Delaware Dept. of Health*, 865 F.2d at 1414.

*Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000)(footnotes omitted). Restated differently, once the Plaintiff establishes a *prima facie* case of an EPA violation, the burden of production and persuasion shifts to the Defendant to establish one of the four defenses within the EPA. *Churchill v. Int'l Business*

*Machines, Inc., Nat. Service Div.*, 759 F.Supp. 1089, 1096 (D.N.J. 1991).

"Congress in prescribing 'equal' work did not require that the jobs be identical, but only that they must be substantially equal." *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir. 1970)(footnote omitted). "[D]ifferent tasks which are only incidental and occasional would not justify a wage differential." *Id.* at 265, n. 10 (citations omitted). Courts must look to job content; "'Mechanical and surface similarities' are inadequate to establish the equality of two positions." *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1171-1172 (3d Cir. 1977).

> "Skill" includes an assessment of such factors as experience, training, education and ability. 29 C.F.R. § 1620.15. "Effort" refers to the physical or mental exertion needed to perform the job. 29 C.F.R. § 1620.16. "Responsibility" concerns the degree of accountability required in performing a job, with emphasis on the importance of the job obligation. 29 C.F.R. § 1620.17. These three terms-skill, effort, responsibility-"constitute separate tests, each of which must be met in order for the equal pay standard to apply." 29 C.F.R. § 1620.14(a).

*Welde v. Tetley, Inc.*, 864 F.Supp. 440, 442 (M.D.Pa. 1994).

The Defendant contends that the Plaintiff cannot demonstrate a *prima facie* case for each of her three counts (alleging violations of Title VII, EPA, PHRA, respectively) set forth in the complaint.

The Plaintiff's EPA claim alleges that the Plaintiff was not paid equal pay as compared to what had been paid to males who worked as plant managers *and* production managers. As to the EPA claim, the Defendant argues that the Plaintiff cannot prove that the Plaintiff ever held the position of plant manager and second, that she cannot prove that the male *production* managers were actually paid more than the Plaintiff for equal work performed at that position as there was no comparator with the Plaintiff for the production manager position. Defendant's Brief, pp. 4-8. The Defendant also contends that

Schoening and Swatsworth were not production managers and possessed "electrical engineering and maintenance skills which the Plaintiff admittedly did not have...." Defendant's Brief, p. 8.

The crux of the Defendant's argument goes to the much litigated issue of whether the differences in job title and description are sufficient to differentiate and thus explain a difference in pay under the EPA. It has long been recognized that "[t]he courts have been required to look beyond the job title to determine whether the jobs are substantially equal." *Brobst v. Columbus Services Int'l*, 761 F.2d 148, 151 (3d Cir. 1985). The Third Circuit has concluded that "Plaintiffs must establish their case by proving actual job content; by the same token the employer may not rely merely on the job description. As our opinions show, the relevant issue is not the name under which the position was classified but what was actually done." *Brobst* at 155 (internal citations and citations omitted). The *Brobst* court went on to recognize "that 'whether two job classifications entail 'equal work' under the Act necessarily must be decided on a case-by-case basis. Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate." *Brobst* at 156 (internal citations omitted). "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, *i.e.*, whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the work substantially different." *Id.* (citations omitted).

**a.) EPA-Plant Manger/Production Manager Claim**

The Plaintiff has admitted that she never held the title of plant manager, but argues that she did perform the work of *plant* manager while working as *production* manager with then-production manager Kelly and that after his termination she performed both jobs for different periods of time including March 2003 until August 2003, that she later trained individuals hired for the plant manager

positions and argues that the fact that the Plaintiff refused the job of plant manager at one point in the past does not negate the fact that the Plaintiff did in fact perform the job after that point. Plaintiff's Brief pp. 4-6.[4]

It remains disputed for purposes of this motion whether it was Schoelkopf or the Plaintiff who acted as plant manager when that title was officially vacant. See Defendant's Concise Statement of Undisputed Material Facts (hereinafter "Defendant's Statement") and Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (hereinafter "Plaintiff's Response") ¶ 7. There is a dispute as to whether the Plaintiff was offered the job of plant manager once or twice, once in August 2001 and possibly again in March 2003. ¶¶ 13, 28. The Plaintiff also contends that she trained Hupp for the position of plant manager and that he assumed duties of production manager in November 2003 after the reorganization that gave the Plaintiff the title of Manager of Human Resources, Office and Shipping. ¶ 31. It is also disputed whether the Plaintiff was performing the job of production manager prior to receiving that title on June 19, 2002. See Defendant's Statement and Plaintiff's Response, both at ¶ 19. The evidence of record reveals that the Plaintiff performed the functions of plant manager during times when that title was vacant while also performing her assigned title of production manager. It is also clear that when she was reassigned to the title of Manager of Human Resources, Office and Shipping, her responsibilities were changed in that she did not supervise production, but safety, safety issues and inspections, inventory, human resources and she supervised

[4]Although the Plaintiff argues for an EPA violation as to the Plant Manager position alone, such a claim fails as the Plaintiff was never responsible for plant management tasks alone but always in conjunction with the responsibilities of her position of production manager. Thus no basis exists for such a claim as there are no comparators to the Plaintiff for this claim and such a conclusion will be evident in the following discussion.

less people while her production responsibilities were transferred to Hupp in November 2003 and thereafter to the co-plant managers, Schoening and Swatsworth. It is undisputed that the salaries of the Plaintiff and the males who performed the responsibilities of plant manager did in fact differ. However, the skill, effort and responsibility of those positions must be evaluated. The Plaintiff's skill was certainly such that it encompassed the experience, education and ability necessary to perform the functions of the plant manager position concerning which she was asked to train Hupp and Schoening and Swatsworth. The effort required to perform both the plant manager and the production manager positions has not been definitively outlined through the submissions of the parties, but it is clear from the record that the combination of both duties in one person, as occurred with regard to Hupp, around November 2003, created a situation which was overwhelming as he indicated he could not do all of the work; meanwhile the Plaintiff did such work while filling in as plant manager although she was also responsible for production management. The responsibilities of the plant manager are clearly not inconsequential. It is also clear that the responsibilities of Schoening and Swatsworth were similar throughout the tenure of Hupp and his successors as the co-plant managers, and the Plaintiff's responsibilities were similar when she was production manager and "filled in" as plant manager. The combination of the responsibilities of what appears from the record to be the two highest positions within the Defendant's operation certainly was similar between the Plaintiff, Hupp, and Schoening and Swatsworth.

While it is true that the Plaintiff was the only person to hold the title of production manager, the evidence demonstrates she assumed the duties of plant manager at certain times while holding the position of production manager. The question is how can she be legally compared with the males who

never performed the position of production manager by itself, but only performed that responsibility while also holding the title of plant manager. The Court does not find the arguments of the Defendant credible on this issue as the EPA requires the Court to look to the job performed, not the title it was given. There exists evidence that the Plaintiff did perform the duties of plant manager from March 2003 until August 2003. The assertion that Schoelkopf performed the plant manager duties is also contradicted in the record as he was not present on a daily basis in the plant, and it was the Plaintiff, not Schoelkopf who trained Huff for the plant manager position.

The Defendant raises the applicability of the Equal Employment Opportunity Commission's regulations regarding the EPA and argues that the applicable regulation permits the reassignment of the Plaintiff to plant manager while keeping her at her production manager rate on a temporary basis while Defendant attempted to find a new plant manager. Defendant's Reply Brief (Document No. 35) pp. 5-7. However, the circumstances of the case *sub judice* are not so clear cut.

The applicable regulation reads in pertinent part:

> b) For a variety of reasons an employer may require an employee, for a short period, to perform the work of a job classification other than the employee's regular classification. ...For instance, an employer who must reduce help in a skilled job may transfer employees to less demanding work without reducing their pay, in order to have them available when they are again needed for their former jobs. Although employees traditionally engaged in performing the less demanding work would be paid at a lower rate than those employees transferred from the more skilled jobs, the resultant wage differential would not constitute a violation of the equal pay provisions since the differential is based on factors other than sex....Temporary reassignments may also involve the opposite relationship of wage rates. Thus, an employee may be required, during the period of temporary reassignment, to perform work for which employees of the opposite sex are paid a higher wage rate than that paid for the duties of the employee's regular job classification. In such a situation, the employer may continue to pay the reassigned employee at the lower rate, if the rate is not based on quality or quantity of production , and if the reassignment is in fact a temporary one....*Also, failure*

*to pay the higher rate to a reassigned employee after it becomes known that the reassignment will not be of a temporary nature would raise a question whether sex rather than the temporary nature of the assignment is the real basis for the wage differential. Generally, failure to pay the higher rate to an employee reassigned for a period longer than one month will raise questions as to whether the reassignment was in fact intended to be temporary.*

29 C.F.R. § 1620.26 (1986)(emphasis added).

The evidence is not clear that the Plaintiff's performance of plant manager duties can be considered a reassignment. It is clear that the Defendant's present argument is made alternatively to its primary argument that the Plaintiff was never plant manager and it does not concede that she was ever plant manager. For purposes of the motion before the Court, this in itself defeats the Defendant's proffered reason of "a differential based on any other factor other than sex." 29 U.S.C. §206(d)(1). The Defendant's burden here is higher than a typical Title VII claim because after a plaintiff establishes a *prima facie* case it "must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Stanziale v. Jargowsky*, 200 F.3d 101, 108 (3d Cir. 2000).

Furthermore, the primary focus period is March 2003 until August 2003 when Hupp was hired. This period is five months, which certainly can raise questions as to the motivation for the failure to pay a higher rate to the Plaintiff. The Defendant cites cases concerning reassignments lasting longer than a month for persons who were continued to be paid at a higher rate, but who were assigned temporarily to a lower rate assignment, otherwise referred to as "red circle" rates. The Plaintiff is in an opposite position in that she assumed plant manager duties in addition to production manager duties while being paid at her production manager rate. Furthermore, the regulation appears to only consider a

reassignment, not added duties. There exists evidence of record that supports the Plaintiff's contention that she performed the duties of production manager and plant manager from March 2003 until August 2003. The fact that it remains disputed whether the Defendant indeed offered the Plaintiff the plant manager position in March 2003 and she declined it, or if, through her own initiative, she expressed interest in that position at that time, but was ignored by the Defendant, does not support the Defendant's alternative argument made under this regulation because the jury could believe either of the contentions. Finally, the Defendant's argument that Swatsworth and Schoening possessed skills related to maintenance that the Plaintiff did not possess is further belied in the record as it has been indicated that there was very little need for maintenance in the Defendant's operation, that the Plaintiff could repair almost all of Defendant's machines and that she was asked to train Schoening and Swatsworth for the newly created co-plant manager positions. The evidence therefore demonstrates that the Plaintiff possessed management skills the new co-plant managers did not have, but for which she was previously paid a lower rate.

Therefore, a genuine issue of material fact exists whether, at any time, the Plaintiff simultaneously acted as plant manager and production manager for the Defendant but was not paid equally as those males, Hupp and Schoening and Swatsworth who were also responsible for the "'common core' of tasks" of production and plant managers.

**b.) EPA-Production Manager**

The difficulty in the Plaintiff's claims arise in her duties as production manager alone. Whereas a separate plant manager performed the duties of that office along with other duties, only the Plaintiff performed solely the duties of production manager. It is further admitted that the Plaintiff was the only

production manager within the Defendant's operation of the plant prior to the restructuring of the management offices. The issue then becomes who can be a comparator with the Plaintiff as to her duties as production manager alone when no other person was assigned to perform the duties of production manager alone, but rather, such duties were always performed in conjunction with plant manager duties. Clearly, the duties of a plant manager in the Defendant's managerial scheme result in ultimate responsibility for the plant resting with that position, not the production manager. Therefore, any possible comparator for the *production* manager duties was also responsible for *plant* management and thus additional responsibilities existed for such males to perform as they were always assigned both sets of duties.

The differences between the jobs must be judged by the tasks required of each job: "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, *i.e.*, whether a significant portion of the two jobs is identical. The inquiry then turns to whether the differing of additional tasks make the work substantially different." *Brobst v. Columbus Services Int'l*, 761 F.2d 148, 156 (3d Cir. 1985). It is clear that greater responsibility and effort were required of those who held the position of both plant and production manager than the Plaintiff who at the comparable times only held the production manager position. The Court notes that the Plaintiff possessed experience and knowledge superior to the alleged comparators in the production manager position. However, the differences of tasks and responsibility between the two jobs result in a finding that the work was substantially different. In light of the undisputed facts in the case *sub judice*, the Court concludes that the Plaintiff's position of production manager cannot be compared to the position held by Huff, and Schoening and Swatsworth who all performed the duties of production manager but only when such

duties were combined with plant manager responsibilities as well. Therefore, any claim of disparate salary between the Plaintiff while she was production manager as compared to any individuals performing that job in addition to plant manager must be dismissed.

**2. TITLE VII/PHRAClaims**

Title VII claims of sex-based discrimination in the workplace, when based upon circumstantial evidence, will typically be analyzed at the summary judgment stage in accordance with the three step burden shifting framework found in the case *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d. 668 (1973) wherein, depending upon the type of claim, the *prima facie* elements may differ but the three steps never change. *McDonnell Douglas* at 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677-678, n. 13. The plaintiff must first establish his/her *prima facie* case, then the burden of production shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection"; and if the employer establishes that reason, the burden of production shifts back to the plaintiff to demonstrate that the employer's articulated reasons were in fact "pretext" for the employer's discriminatory actions. *McDonnell Douglas* at 802-806, 1824-1826, 36 L.Ed.2d 668, 677-680. This framework does not apply to claims of hostile work environment or constructive discharge but other standards govern such analyses. *See infra.*

The burden on a defendant at the second stage when a legitimate, non-discriminatory reason is offered is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3rd Cir. 1994). At the summary judgment stage, the Third Circuit has set forth the law governing procedure in such motions with regard to what a plaintiff must do to survive such a motion after the defendant offers a legitimate, nondiscriminatory reason:

This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See, e.g., Hicks*, 509 U.S. at ----, 113 S.Ct. at 2749; *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir.1992) (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095), cert. denied, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). In other words, because the factfinder may infer from the combination of the plaintiff's *prima facie* case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, *see Hicks*, 509 U.S. at ----, 113 S.Ct. at 2749, a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case.

***

...to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, *see Logue v. International Rehab. Assocs., Inc.*, 837 F.2d 150, 155 (3d Cir.1988) (holding that "the district court erred in failing to consider all of [the employer's] proffered evidence of legitimate business reasons for [the plaintiff's] termination" (emphasis supplied)), aff'd after remand, 866 F.2d 1411 (3d Cir.1989), was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). *See Anderson*, 13 F.3d at 1124; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir.1993).[7]

[7] We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the

remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. *See Ezold*, 983 F.2d at 531, 533; *Villanueva v. Wellesley College*, 930 F.2d 124, 131 (1st Cir.), cert. denied, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," *Ezold*, 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."[8] *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir.1993) (internal quotation omitted); see *id.* at 638 (holding that the proper inquiry is whether the plaintiff has proffered sufficient evidence of "inconsistencies and implausibilities in the employer's proffered reasons"); *Ezold*, 983 F.2d at 527 ("[A] plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision." (internal quotations omitted)); *Chauhan*, 897 F.2d at 128. While this standard places a difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Ezold*, 983 F.2d at 531.

[8] Of course, a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak.

*Fuentes v. Perskie*, 32 F.3d 759, 764-765 (3d Cir. 1994). This burden shifting analysis of *McDonnell Douglas* applies to claims under Title VII. *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 68-69 (3rd Cir. 1996). In addition, the PHRA is interpreted similarly to Title VII. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir.1996). Therefore, for purposes of this Memorandum Opinion, the Court's analysis and conclusions in regard to the Title VII claims, apply equally to all parallel claims made by the Plaintiff under the PHRA.

**a.) Title VII/PHRA Sex-Based Discrimination Based Upon Pay Differential**

The Defendant notes that the Plaintiff may have impliedly stated a claim for sex-based wage discrimination under Title VII. Because of the potential of Count I of the Amended Complaint (Document No. 9) for stating such a claim, the Court must analyze this issue.

The Defendant moves for summary judgment on this claim based upon four arguments: 1) the Plaintiff has no comparators; 2) any difference in salary is based upon "experience and qualifications"; 3) lack of evidence that the difference in salaries was based upon sex; and 4) and lack of evidence of pretext. Defendant's Brief, p. 9.

The Plaintiff counters these arguments with her own terse argument that she has satisfied the elements of the EPA for both the production and plant manager positions, while the Defendant has not proven that any of the four defenses of the EPA exist. Plaintiff's Brief, pp. 8-9. Unfortunately, the Plaintiff misjudges the applicable standards for a Title VII sex-based wage discrimination claim.

The Supreme Court in *County of Washington v. Gunther*, 452 U.S. 161, 168, 181, 101 S.Ct. 2242, 2247, 2254, 68 L.Ed.2d 751, 759, 767 (1981) found that the four defenses applicable to claims made under the EPA were also applicable to sex-based wage discrimination claims made under Title VII, but the Supreme Court declined to outline what is required of plaintiffs in proving a Title VII sex-based wage discrimination claim. The Court of Appeals of the Third Circuit has not reached this issue since the decision in *Gunther*, but two district court judges from our sister district of New Jersey have analyzed the issue. *Farrell v. Planters Lifesavers Co.*, 22 F.Supp.2d 372, 388-389 (D.N.J. 1998)(*rev'd on other grounds*, *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 275 n. 2 (D.N.J. 1998)); *Churchill v. I.B.M, Inc., Nat'l Serv. Div.*, 759 F.Supp. 1089, 1096 (D.N.J. 1991). The closest the Court of

Appeals came to a recognition of such a Title VII cause of action is found in *Bereda v. Pickering Creek Indust. Park, Inc.*, 865 F.2d 49, 51 n. 1 (3d Cir. 1989), but the Court did not engage in any discussion concerning the contours of such a Title VII claim that incorporates the EPA defenses.

*Churchill and Farrell* treated such claims under the *McDonnell Douglas* framework requiring the Plaintiff to first establish a *prima facie* case of discrimination. *Churchill* at 1097-1099. *Farrell* at 389-390. In light of the scant case law present in this circuit on sex-based wage discrimination claims under Title VII, it is no surprise that the parties did not brief this issue more fully. Despite the limited arguments of both parties in this area, the Court will evaluate the Title VII sex-based discrimination claim by adopting and following the analyses found in *Churchill* and *Farrell* and applying those analyses to the factual record before the Court.

*Farrell* specifically states: "A plaintiff establishes a *prima facie* case of sex-based wage discrimination by showing that 'she occupies a job similar to that of higher paid males.'" *Farrell* at 389 (citations omitted). With respect to holding the positions of production manager and plant manager simultaneously, the record supports such a claim, but the record does not support such a claim for production manager alone or plant manager alone. The point of difference again is the comparison of the jobs-no male comparators solely performing the production manager position exist under the circumstances. Additionally, the Plaintiff never performed the duties of plant manager solely, but always in conjunction with the production manager duties and thus the Plaintiff's tasks cannot be compared to those males who only performed the tasks of plant manager. Thus, there is no proof of discrimination in respect to wages for the production manager position. As for the simultaneous duties of production manager and plant manager, comparators do exist and such comparators were paid more

on average for performing the same work. Thus, with a shift in burden to Defendant to prove some non-discriminatory motive for the seemingly sex-based salary differential, the Court considers the Defendant's four arguments on this matter. As for the first and second arguments, the Court finds that comparators did exist for the duties of production and plant management positions, that the experience and qualifications of Hupp, Schoening and Swatsworth were in question because of the fact that the Plaintiff was asked to train all three for their respective positions and the lack of managerial experience of Schoening and Swatsworth who were asked to replace Hupp who along with the Plaintiff did have managerial experience. See *supra*, pp. 5, 7. The Defendant's final arguments that the Plaintiff cannot bring forth evidence that the difference in wages was based upon sex and that the Plaintiff cannot establish the "alleged pay disparity was a pretext for discrimination based on sex" (Defendant's Brief, p. 9) are not legitimate, non-discriminatory reasons for the disparity in wages between males as compared to the Plaintiff when such individuals performed the combined duties of plant and production managers. Thus, summary judgment is granted for the Defendant as to any claim the Plaintiff has made under Title VII with respect to sex-based wage discrimination in the production manager position alone, but summary judgment is denied as to any Title VII sex-based wage discrimination for disparity in pay between the Plaintiff and Hupp and Schoening and Swatsworth when such individuals performed the duties of production and plant manager simultaneously.

**b.) Title VII/PHRA Failure to Promote Claim**

The Plaintiff alleges both a failure to promote and a demotion under Title VII.

A *prima facie* claim for the failure to promote allegation is established through four facts: 1) "that [the Plaintiff is a member of a] protected class", in this instance, a female, 2) that the Plaintiff

"applied for and was qualified for the job", 3) "that despite [her] qualifications, [s]he was rejected", and 4) "that the employer either ultimately filled the position with someone [outside of the protected class] to permit an inference of [gender discrimination] or continued to seek applicants from among those having plaintiff's qualifications." *Barber v. CSX Distribution Services*, 68 F.3d 694, 698 (3d Cir. 1995)(applying the *McDonnell Douglas* framework to a failure to promote based upon age discrimination)(citing *Fowle v. C & C Cola*, 868 F.2d 59, 61 (3d Cir. 1989)).

The Plaintiff is clearly a member of a protected class in being a female. The next issue is whether the Plaintiff applied for and was qualified for the position. Evidence exists that the Plaintiff was certainly qualified for the position having performed the duties of plant manager while assigned to the position of production manager. However, the Plaintiff must have also applied for the position. It is undisputed that Schoenkopf had offered the plant manager position to the Plaintiff in August 2001, but she allegedly refused based upon her lack of familiarity with the metallizing process, the fact of which the Plaintiff argues Schoenkopf was aware. The Defendant argues the plant manager position was offered a second time to the Plaintiff, but this fact has been disputed by evidence of record. Plaintiff's Appendix (Document No. 30), Exhibit 1, Fuller Depo., pp. 60, 67, 154-155. Although the Defendant argues that the Plaintiff did not voice any interest in the plant manager position in January 2004 when Schoening and Swatsworth were hired as co-plant managers, the Plaintiff indicates that she was not given an opportunity to voice interest in the position at that time as she was explicitly told that Hupp was being replaced by these two male employees. The Plaintiff also testified that she expressed interest to Schoelkopf regarding the plant manager position in March 2003.

It is clear that the Plaintiff's declination of the job offer in August 2001, cannot rise to a claim of

Title VII gender discrimination for failure to promote. In fact, the Plaintiff turned down the offer indicating that she was not sufficiently familiar with the metallizing process. Plaintiff believes that Schoelkopf was aware that this was the circumstance which caused Plaintiff to refuse the offer. The Court cannot say under these circumstances that a *prima facie* case of failure to promote occurred because an offer was made, but the first element of qualifications, specifically as to the Plaintiff's knowledge of metallizing and the third element of rejection did not exist. However, the evidence demonstrates Shoelkopf's knowledge that the Plaintiff's lack of familiarization with metallizing was the one thing that prevented the Plaintiff from accepting the plant manager position at that time, and the Plaintiff's later familiarization with the process further supports the idea that the Plaintiff was qualified and therefore interested in the position when it became vacant again. See Plaintiff's Response (Document No. 28) ¶ 16 (deposition record cited therein). This familiarization is supportive of the Plaintiff's claim that she later expressed to Schoelkopf an interest in the plant manager position in March 2003.

It is claimed that the Defendant again offered the Plaintiff the plant manager job in March 2003, but the Plaintiff has testified otherwise. As indicated above, the Plaintiff has testified that she indicated interest in the plant manager position in March 2003, but no action was taken by the Defendant and she continued to perform the duties of plant manager while performing the duties of her assigned position of production manager until Hupp was hired as plant manager in August 2003. Thereafter, in January 2004, when Hupp was fired, the Plaintiff was notified that Schoening and Swatsworth were to be co-plant managers. According to the Plaintiff, she was not given the opportunity to voice interest in that position at that time.

In *Fowle v. C&C Cola*, 868 F.2d 59 (3d Cir. 1989), the Third Circuit concluded that one need not apply for a position by filing an application but need only " establish[] that the company had some reason or duty to consider him for the post." *Fowle* at 68 (quoting *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir. 1984)). The Plaintiff in *Fowle* worked in a separate company, and had last contacted the company for which he sought employment over seven months prior to the time when the positions sought had become vacant.

Unlike the plaintiff in *Fowle*, the Plaintiff in the case *sub judice* has presented evidence that she voiced interest in the plant manager position in March 2003, five months prior to the hiring of Hupp and that during these five months she performed the tasks associated with the plant manger position despite not being given that title. When Hupp was released in January 2004, the Plaintiff was not offered the plant manager position, but told that two other employees had been named co-plant managers. In considering the evidence of the Plaintiff's interest in the position ten months prior to the hiring, as well as the fact that she performed plant manager duties for five months after that, then trained Hupp when he was hired as plant manager in August 2003 and that she had continually worked for the Defendant throughout these occurrences, the evidence is sufficient to conclude that the Plaintiff has established this *prima facie* element irrespective of the absence of an offer of the plant manager position from at least March 2003 forward.

Thereafter, it is clear from the record that the Plaintiff was not hired and Hupp and Schoening/Swatsworth were hired for the plant manager positions. Because all three of these people were men, that is persons outside of the protected class, and the Plaintiff was in effect rejected from the plant manager position, the Plaintiff has established a *prima facie* case of a failure to promote.

Thus, the burden of production shifts to the Defendant to express a "legitimate, nondiscriminatory reason" for the hiring of Hupp and Schoening/Swatsworth for the plant manager positions. The Defendant argues that the fact these people were all men does not equate to evidence of gender discrimination and that these people were qualified for these positions. The Defendant further argues that the Plaintiff's qualifications for plant manager were never lacking, but that she had twice refused the offer for this job. These reasons appear to present a legitimate, non-discriminatory reason for the Defendant's actions.

It is disputed whether the plant manager position was offered to the Plaintiff a second time. Schoelkopf states that he made an offer of the plant manager position to the Plaintiff twice and with two refusals by the Plaintiff, he did not offer it a third time and therefore, he subsequently hired individuals he believed to be qualified and not because all of them were male. Defendant Appendix (Document No. 19), Exhibit A, ¶¶ 18, 19 24, 25, 26, 32-42. The declaration of Schoelkopf and the deposition testimony of the Plaintiff differ (Plaintiff's Appendix, Exhibit 1, pp. 60, 67, 217-218) and this Court is not to make credibility determinations on summary judgment, but must leave this issue for the trier of fact. *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993). The additional argument that the Plaintiff refused the *second* alleged offer because she was still not familiar with the metallizing process being performed by the Defendant has been countered as well by the Plaintiff's testimony that after becoming familiar with the process she expressed interest in the plant manager job in 2003. Because the factfinder could disbelieve the Defendant's articulated reason and find the Plaintiff credible, summary judgment is not appropriate for two of the three of the Plaintiff's failure to promote claims. Therefore, a genuine issue of material fact exists as to the Plaintiff's claims for failure

to promote under Title VII in March 2003 and January 2004, but not August 2001.

The record supports the argument for pretext as a result of certain circumstances. Despite the Defendant's arguments that the Plaintiff has only offered subjective beliefs and not affirmative evidence of her claims to defeat summary judgment, the Court disagrees. The record, as will be analyzed here demonstrates that for purposes of summary judgment, the Defendant's proffered reasons for its action could be considered pretext by a trier of fact.

The Defendant also offers the "common actor" theory to refute a finding of pretext because Schoelkopf had promoted and given pay raises to the Plaintiff in the span of a year and one half. The Defendant would have this Court apply the "common actor" presumption as recognized in *Roberts v. Separators, Inc.*, 172 F.3d 448 (7th Cir. 1999) in analyzing the issue of pretext in the case *sub judice*. The "common actor" presumption is a presumption that when a person who is within a protected class of persons is hired and then terminated by the same person within a relatively short period of time this demonstrates that that person did not act to terminate that person within a protected class with a purpose of discrimination. *See Proud v. Stone* 945 F.2d 796, 797 (4th Cir. 1991). However, the Third Circuit has not adopted this theory as a presumption to be followed, but only as a theory to be considered when evaluating evidence that could refute an employer's proffered reason for the termination. *Waldron v. SL Industries, Inc*, 56 F.3d 491, 496 n. 6 (3d Cir. 1995). It is undisputed however, that Carr twice promoted the Plaintiff prior to her being offered the plant manager position by Schoelkopf, in August 2001, which is when she refused it knowing she did not understand the metallizing process. Meanwhile, Schoelkopf had the final authority to approve pay increases. Defendant's Appendix, Fuller Deposition, pp. 36, 38. The Defendant contends that Schoelkopf did not suddenly determine to discriminate against females after

giving these promotions and wage increases to the Plaintiff. However, the evidence is undisputed that Carr gave the first two promotions and there is also evidence that Kelly, with some type of oversight or approval from Schoelkopf, approved the production manager position for the Plaintiff. Therefore, the "common actor" theory appears to be in dispute from the present facts as Schoelkopf is not the only person involved in the promotion and wage increases. Further, as noted by the Third Circuit in *Waldron*, the application of the "common actor" theory in the case *sub judice* could also be disbelieved by a jury should the jury find that the Plaintiff was promoted and retained by Schoelkopf in order to use her knowledge to "groom" males who were being promoted to positions above her and then after such grooming was complete, the Plaintiff was to be terminated, or in this case, allegedly constructively terminated.

The Defendant also argues that when the production manger position was eliminated it did not have to retain the Plaintiff, however, it placed her in the position of Manager of Human Resources, Office and Shipping. While this may be true, it is also but another outlook on a matter that has more than one plausible explanation. It is also possible that a trier of fact could once again view the retention of the Plaintiff, this time, with different responsibilities, fewer persons to supervise, and on a management level now equal to supervisors, for the purpose of later grooming Schoening and Swatsworth who were hired as co-plant managers two months after the Plaintiff's transfer.

The Defendant also argues that the testimony of other female employees of the Defendant is irrelevant to the Plaintiff claims as they are not comparators and that the Plaintiff's own testimony is inconsistent. The Plaintiff does not directly address these arguments. Nevertheless, the lack of comparators does not preclude the Plaintiff from establishing an argument that pretext exists. The previous analysis as well as the following analysis demonstrates how the evidence can be viewed as

establishing pretext. As for the alleged inconsistencies in the Plaintiff's testimony, the Defendant's argument itself is based upon its subjective interpretations of the Plaintiff's deposition testimony which are disputed by evidence of record or otherwise clarified through other parts of the deposition testimony.

The evidence of record belies the Defendant's offer of a legitimate, nondiscriminatory reason for the actions it took with respect to the Plaintiff. Starting with the qualifications of Hupp, Schoening and Swatsworth, the record indicates that Hupp is the only one who appears to have possessed managerial experience as a production manager in his former employment with Ferro Corporation (Defendant's Appendix, Exhibit E, pp. 35-36) before becoming a sales representative with that corporation. Schoening and Swatsworth were maintenance workers who apparently had no managerial experience. The Defendant offers that Schoening and Swatsworth had mechanical and electrical experience that the Plaintiff did not have. While these two individuals may have had such experience, the Plaintiff possessed similar abilities according to the record. Nevertheless, such abilities were not at the forefront of Hupp's description of the plant manager position, nor the Plaintiff's description of the production manager position, and it is undisputed that the co-plant manager positions held by Schoening and Swatsworth were positions that encompassed both plant and production manger tasks. The Plaintiff points out that she could perform repairs on all machines at the Curwensville plant except the "three color machine" and the mirror coating machine; no one, including the Plaintiff could "set up" the three color machine while the Plaintiff worked for the Defendant. The limitations of the experience of the three men also come into focus when one considers that the Plaintiff had to train all of them despite Schoening and Swatsworth being workers within the Defendant's plant and Hupp having previously been a manager.

The Defendant's actions are also inconsistent to the extent that Hupp was replaced by Schoening

and Swatsworth. Hupp possessed experience as a manager, however, Schoening and Swatsworth did not possess such experience. Moreover, all three had to be trained by the Plaintiff as to the production and plant management processes. Schoening and Swatsworth were hired from non-management positions into management. Moreover, a trier of the facts could find the evidence supportive of the proposition that the Plaintiff was performing the duties of production manager and plant manager from March 2003 until Hupp's arrival in August 2003 with difficulties which were related to the amount of tasks required of her, despite her experience performing the tasks of both positions. However, Plaintiff was not offered the job of plant manager, Hupp took that position and subsequently performed the tasks of production and plant manager unsuccessfully until the jobs of co-plant managers were offered to Schoening and Swatsworth without a prior offer to the Plaintiff to take one of the co-plant manager jobs. These offers were made despite the fact the Plaintiff performed the tasks entailed in such positions previously and also trained Schoening and Swatsworth in these newly created positions. Such a view of the facts supports the argument that the Defendant's proffered reason is not to be believed. Indeed, Hupp described the job of plant manager as "[o]verseeing day-to-day running of the business, everything from safety to production, inventory control, purchasing." Defendant's Appendix, Exhibit E, p. 36. The Plaintiff described the production manager duties as having "[t]o schedule orders being produced and leaving on a timely manner. Overseeing the people in general, any questions, and then reporting them back to the plant manager if necessary." Defendant's Appendix, Exhibit B, p. 54. The oversight was as to "[a]ll departments" and "department supervisors". *Id.* Even with managerial experience and training from the Plaintiff, the Defendant terminated Hupp and replaced him with two individuals with maintenance, but no managerial, experience to perform plant and production management tasks the Plaintiff had previously performed

simultaneously under what can be considered unidyllic conditions.

The Court finds that this evidence tends to prove that the Defendant's proffered reason for the hiring of Schoening and Swatsworth could be considered pretext by a trier of fact.

For these reasons, the Court finds that the Plaintiff has presented sufficient evidence of pretext as to the Plaintiff's failure to promote claims as of March 2003, August 2003 and January 2004 to survive summary judgment.

**c.) Title VII/PHRA Demotion/Adverse Employment Action Claim**

Although labeled a "demotion" claim by the parties, the adverse employment action of assigning the Plaintiff to the position of Manager, Human Resources, Office and Shipping, claimed by the Plaintiff can be differentiated from demotion claims by the fact that a transfer of a plaintiff to a different position of employment with the same employer can be an adverse employment action for the pruposes of establishing discrimination under Title VII.

The Plaintiff again must first make out a *prima facie* case of discrimination by establishing by a preponderance of the evidence that:

> (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by her position; (3) she suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise to an inference of discrimination. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir.2003); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

*Langley v. Merck & Co., Inc.*, 186 Fed.Appx. 258, 259 (3d Cir. 2006). It has been noted that a change in "title, office, reporting relationship and responsibilities" is insufficient to establish an adverse employment action. *Langley v. Merck & Co.*, 186 Fed Appx. 258, 260 (3d Cir. 2006)(*see* footnote two

recognizing the application of Title VII employment discrimination to claims under 42 U.S.C. § 1981, citing *Schurr v. Resorts Int'l. Hotel, Inc,* 196 F.3d 486, 498-499 (3d Cir. 1999)). Among the changes in the employment position in *Langley* was that the plaintiff no longer supervised employees, the job title and responsibilities changed but there was no loss of benefits and she reported to "the same position that she previously held." *Id.* The Court of Appeals ultimately affirmed the district court's granting of summary judgment for Merck and against Langley. *Id.* at 262.

The Plaintiff clearly did not suffer a reduction in pay, she no longer had supervisors reporting to her, but instead supervised a smaller staff through her new position. The Plaintiff's responsibilities changed. The Plaintiff still reported to Hupp, but now Hupp performed the duties of plant manager and the Plaintiff's former duties of production manager. On a factual basis, the case *sub judice* is very similar to *Langley* in terms of the alleged adverse employment action and the Court finds no reason to conclude that the case *sub judice* should be analyzed differently. An adverse employment action has been noted as an action being "serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment...." *City of Pittsburgh v. Robinson*, 120 F.3d 1286, 1300 (3d Cir. 1997)(*abrogated on other grounds by Burlington Northern & Santa Fe Railway Co. v. White*, ___U.S.___, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006))(finding that claims of retaliation under Title VII can encompass broader act not encompassed within the scope of Title VII's substantive discrimination prohibition)).

The Plaintiff cites to *Burlington Industries, Inc v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633, 652-653 (1998) and *Crady v. Liberty National Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir. 1993) for the proposition that reassignment to a position with differing responsibilities

and " a less distinguished title" can establish "a tangible employment action." But that term was given specific meaning in the context of employer liability for supervisor discrimination, an issue not present in the case *sub judice*:

> In the context of this case, a tangible employment action would have taken the form of a denial of a raise or a promotion. The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving race, age, and national origin discrimination, as well as sex discrimination. Without endorsing the specific results of those decisions, we think it prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue we consider here.

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633, 652 (1998). Additionally, to the extent *Crady*, a Seventh Circuit case, can be read as permitting a claim of discrimination because of re-assignment to a less prestigious job title and diminished responsibilities, the Court does not believe the Plaintiff has set forth evidence in the record that demonstrates a genuine issue of material fact as to that claim, even if this Court followed *Crady*. The action of re-assigning the Plaintiff to the position of Manager of Human Resources, Office, and Shipping along with the accompanying change in employees supervised, responsibilities tasked, and her position within the Defendant's hierarchy of employees have not been demonstrated as establishing a basis for a reasonable person, looking at this record, to find the Defendant's actions serious enough to establish a claim for an adverse employment action. Therefore, summary judgment is granted as to this claim.

**d.) Hostile Work Environment Claim**

In order to establish a Title VII claim for hostile work environment, a plaintiff must establish five elements: "(1) the employee[] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive [or severe]; (3) the discrimination detrimentally affected the plaintiff; (4)

the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990); *Jensen v. Potter*, 435 F.3d 444, 449 n. 3 (3d Cir. 2006). *See also Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001). "In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Id.* (citations omitted). When considering such claims, courts must consider the "totality of the circumstances" *Andrews* at 1482. *See also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295, 302 (1993). The Court of Appeals for the Third Circuit has also recognized that conduct evidencing a hostile work environment need not always be sexually charged, provocative or offensive, but can be non-sexual and even "facially neutral" in nature. *Durham Life Ins.Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999)("The facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constituted the hostile work environment"). *See also Andrews* at 1485 ("To the extent that the Court ruled that overt sexual harassment is necessary to establish a sexually hostile environment, we are constrained to disagree").

The Plaintiff makes a claim for hostile work environment based upon a consideration of various facts from the record that detail the treatment of the Plaintiff while she was employed with the Defendant. Plaintiff's Brief, pp. 14-17. The Defendant in its brief analyzes the five elements of a hostile work environment claim and argues that the alleged actions taken against the Plaintiff were not based upon any sexual discrimination while specifically arguing that the Plaintiff's difficulties with anxiety and depression are unrelated to her claims of discrimination. Defendant's Brief, pp. 14-16. See also Defendant's Reply (Document No. 35), pp. 10-11.

The record reveals that there is a genuine issue of material fact as to whether the Plaintiff suffered discrimination because of her sex as she was not offered the plant manager job when the Defendant was aware of her interest and, additionally, she then had to train the male hires for the plant manager position, the males hired as plant manager were paid more and given more responsibilities than was the Plaintiff while she continually performed these duties during vacancies in these positions, in addition to her assigned duties as production manager, and she was never compensated further or hired for this position.[5] Additionally, Schoelkopf continued to wear his pants in a way that exposed the "crack" of his butt even after the Plaintiff requested that he stop doing so. Furthermore, the evidence of record supports the idea that such actions occurred consistently since the Plaintiff was first offered the plant manager position in August 2001. Contrary to the Defendant's arguments, the Court also finds that the evidence does demonstrate that the actions of discrimination did affect her subjectively and this is clear from her letter of resignation which mentions the factors of the firing of the plant manager, hiring unqualified persons and making the Plaintiff train them and the additional responsibilities assigned to her that she could not effectively manage by herself. Defendant's Appendix, Exhibit B, Deposition Exhibit 9. The Plaintiff's scheduled appointment with her doctor on January 23, 2004 was a follow-up to her January 14th appointment which was based upon her flu symptoms and stressful state of mind. Document No. 30, Exhibit 1, pp. 103-105.

The Defendant ignores the fact that the actions taken by the Defendant in not promoting her,

[5]The evidence presented that Schoelkopf lost his temper and threw a chair, pen, papers, phones, does not describe the context of these events and the Court cannot assume that such actions were directed at the Plaintiff or resulted from or were taken in support of any discrimination against her. Defendant's Appendix, Exhibit B, pp. 254-256. Therefore, these actions were not considered with the other instances stated here. Affirmative evidence of the purported "chauvinism" by male workers was not established on the record and that subjective observation has not been considered either.

as well as her job assignments are evidence of a hostile work environment. These occurrences also support the conclusion that a reasonable person would have been detrimentally affected as well. The Defendant is alleged to have failed to promote the Plaintiff to a position for which she had become qualified, and for which she had trained people, and for which it did not pay her the position's salary during a vacancy when she performed its responsibilities in addition to her assigned responsibilities. In addition to this conduct, Schoelkopf continued to wear his pants in a way that exposed his buttocks after he had been asked not to do so by the Plaintiff.[6] Finally, although the parties do not discuss it, a respondeat superior relationship exists as the person whose actions are in question, Schoelkopf, is the person who hired and fired plant managers and reassigned the Plaintiff to her final position as manager of Human Resources, Office and Shipping. Schoelkopf's authority to act for the Defendant is clear from the undisputed facts above.

Therefore, the Court finds a genuine issue of material fact as to all elements of the Plaintiff's hostile work environment claim and the Defendant's motion for summary judgment is denied as to this claim.

**e.) Title VII/PHRA Constructive Discharge Claim**

The Plaintiff also alleges constructive discharge as a result of a hostile work environment. The Defendant argues that the conditions of Plaintiff's work were such that they were "intolerable", or that the Plaintiff was "demoted", and that Schoelkopf 's act of throwing things was based on sex

[6]Although the Defendant makes much of the fact that the Plaintiff stated in her deposition that she she did not file this civil action because of men wearing their pants in a way that exposed their buttocks, the Defendant mischaracterizes the inquiry and answer of the Plaintiff, as they concerned the acts of *Schoening,* not Schoelkopf, wearing his pants in that specific way and thus being the basis for the current civil action. *See* Defendant's Appendix, Exhibit B, pp. 266-268.

discrimination. Defendant's Brief, pp. 17-18. Further, the Defendant denies intending to force the Plaintiff to quit. Defendant's Brief, p. 18. The Defendant further argues in its Reply Brief that the "reasonable person" standard applicable to this claim would not result in a reasonable person of the same sex who was in the Plaintiff's circumstances also resigning. Defendant's Reply, pp. 11-12.

"We hold that no finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir. 1984). Proof of such is a prerequisite to establishing a constructive discharge claim. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 718-719 (3d Cir. 1997)(citing *Goss*). *See also Pennsylvania State Police v. Suders*, 542 U.S. 129, 149, 124 S.Ct. 2342, 2355-2356, 159 L.Ed.2d 204, 221 (2004). Because the evidence reveals a genuine issue of material fact regarding the Plaintiff's hostile work environment claim, the Plaintiff's constructive discharge claim does not fail despite the Defendant's arguments to the contrary.[7] Applying the "reasonable person" standard to the Plaintiff's constructive discharge claim results in the Court's conclusion that there exists evidence that such a person would resign in light of the conditions permitted by the Defendant. The Plaintiff has produced evidence that essentially supports the theory that Schoelkopf had placed her in the production manager position and planned to keep her there indefinitely without promotion despite her interest in the plant manager position. Added to that were the additional responsibilities of the plant manager position

---

[7]The Defendant has not raised a *Ellerth/Faragher* defense to the actions of Schoelkopf, although that defense is now available in claims for constructive discharge because of hostile work environment. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 148, 124 S.Ct. 2342, 2355, 159 L.Ed.2d 204, 221 (2004).

while the position was officially vacant, the requiring of the Plaintiff to train allegedly unqualified persons, the Plaintiff's eventual transfer to a position with less management responsibilities, and the additional task of the continued training of the two arguably unqualified plant manager hires, all of which supports a claim in that, when viewed in the light most favorable to the Plaintiff, can be seen as an attempt to isolate her, her responsibilities and effectiveness, by increasing her tasks, failing to promote, and removing managerial responsibilities despite not reducing her salary. The added pressures of this situation cannot be seen as benefitting the Plaintiff either as she attempted to continually do what was asked of her, rather, such actions never resulted in a pay raise or promotion. The Plaintiff was in effect, frozen in her position within the Defendant's employee structure with the same adverse actions being taken against her more than once and over weeks and months at a time. The finder of fact could determine that a reasonable person in such a situation would remove herself from such an employment situation. The motion for summary judgment is denied as to the Plaintiff's claim of constructive discharge.

**AND NOW**, this 5th day of January 2007, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion for Summary Judgment (Document No. 17) is GRANTED IN PART as to: 1) the Plaintiff's Equal Pay Act claims for the positions of production manager and plant manager individually; 2) the Plaintiff's Title VII and PHRA "demotion"/adverse employment action claims found in Count II and Count III of the Amended Complaint, respectively; and DENIED IN PART as to: 1) any implied claim under the Equal Protection Act for those periods of time where the Plaintiff was performing the duties of plant manager and production manager simultaneously; 2) any implied claim under Title VII/PHRA for a pay differential claim based upon sex-based discrimination; 3) the Plaintiff's Title VII/PHRA failure to promote claim; 4) the Plaintiff's Title VII/PHRA hostile work environment claim; and 5) the Plaintiff's Title VII/PHRA constructive discharge claim.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**